IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUAN EDGAR ALVAREZ OROPEZA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2604 |
| | § | |
| JANET NAPOLITANO, SECRETARY | § | |
| OF THE DEPARTMENT OF | § | |
| HOMELAND SECURITY; ALEJANDRO | § | |
| MAYORKAS, DIRECTOR OF U.S. | § | |
| CITIZENSHIP AND IMMIGRATION | § | |
| SERVICE; SANDRA M. HEATHMAN, | § | |
| FIELD OFFICE DIRECTOR; ERIC | § | |
| HOLDER, ATTORNEY GENERAL; | § | |
| and U.S. CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After all parties have rested and closed the evidence, and having heard and considered the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## Findings of Fact

**From a preponderance of the evidence, the Court finds as follows:**

### Summary of Background

1.   Plaintiff Juan Edgar Alvarez Oropeza was born in Mexico and has been a permanent resident of the United States since

June 4, 2002.  He is married to an illegal alien, and has three children, two of whom, ages 9 and 7, were born in the United States.

2.    Plaintiff does construction work, and has been an independent contractor during most if not all of the time relevant to this case.  During more favorable economic times he employed dozens of workers in his construction business.

3.    On or about August 31, 2007, Plaintiff filed with the U.S. Citizenship and Immigration Services ("USCIS") an Application for Naturalization, INS Form N-400, to which Plaintiff subscribed under penalty of perjury on August 21, 2007.

4.    USCIS interviewed Plaintiff on his Application for Naturalization on June 6, 2008.

5.    USCIS denied Plaintiff's Application for Naturalization on June 9, 2008, based on a finding of lack of good moral character.

6.    Plaintiff administratively appealed his naturalization denial by filing a Form N-336, Request for Hearing.

7.    On April 16, 2009, USCIS on appeal affirmed the denial of Plaintiff's Application for Naturalization for lack of good moral character.

8.    On August 14, 2009, Plaintiff filed this case for a *de novo* review and trial on his Application for Naturalization pursuant to 8 U.S.C. § 1421(c).

9. USCIS denied the Plaintiff's Application for Naturalization because of his having made false statements under oath in answers to questions asked during an interview by a USCIS officer on June 6, 2008, and because he did so with a subjective intent to deceive USCIS for the purpose of obtaining immigration benefits.

10. Plaintiff's allegedly false statements were made in reply to questions as to whether Plaintiff had ever been arrested, cited, or detained by any law enforcement officer (including USCIS or former INS and military officers) for any reason, whether he ever had been arrested or detained by a law enforcement officer, including immigration, whether he had ever smuggled controlled substances or drugs into the country, whether he had ever been issued a ticket or fine by an immigration officer for any illegal activity, and similar questions.

11. In his written and oral responses to such questions, Plaintiff replied in the negative and wholly failed to disclose the circumstances of his having been stopped, detained, processed, and cited by Customs and Border Protection (CBP) for concealing and attempting to carry anabolic steroids, a controlled substance, into the United States without declaring them upon his return from Mexico on December 21, 2003.

Plaintiff's Detention During the December 21, 2003 Border Stop

12.  On December 21, 2003, Plaintiff and his friend, David Robert DuBois, arrived at Laredo, Texas Bridge No. 1 in a 2003 Dodge Neon, owned by Plaintiff, but with DuBois driving.  Plaintiff rode in the front passenger seat.

13.  At primary inspection, the driver DuBois made an oral declaration that they were carrying one liter of alcohol, Tequila, and also a bag of medicines, such as Claritin, which DuBois exhibited by handing the bag to the inspection officer.  The officer inspected the contents of the bag at his bench and returned it to DuBois.

14.  DuBois and Plaintiff were then cleared at primary inspection.  Some vehicles clearing primary inspection, however, are randomly directed to the "pit" for secondary inspection.  As it happened, on this day DuBois was directed to the "pit."

15.  Having been directed into secondary inspection, DuBois and Plaintiff were asked to exit their vehicle, and a thorough inspection was made under the direction of Customs and Border Patrol Officer David Antonio Gammon.

16.  During the course of this inspection, Officer Gammon, who testified at trial, found concealed underneath the front passenger seat where Plaintiff had been seated ten vials of anabolic steroids, a controlled substance.

4

17. When Plaintiff asserted that the steroids minutes before had been in the bag of medicines presented by DuBois in primary inspection, Officer Gammon went back to the CBP officer in primary to verify Plaintiff's claim. In such instances--if some substances such as anabolic steroids are declared--CBP will seize the contraband but not fine or sanction the declarant. Officer Gammon learned from the inspecting officer that the steroids were not in the bag presented by DuBois and were not declared.

18. At this point, Officer Gammon ordered Plaintiff, who admitted that the steroids were his, into the nearby CBP building. DuBois was ushered to a waiting room to wait for Plaintiff to be processed by CBP officers.

19. Officer Gammon escorted Plaintiff to a secured secondary area where Officer Gammon detained him pending determination by Gammon's supervisor as to whether Plaintiff would be arrested and charged criminally or dealt with administratively.

20. The on-duty supervisor, CBP Officer Mauro Lopez, responded to the notification that concealed controlled substances had been found in Plaintiff's possession, he examined the anabolic steroids, and he ultimately decided to process Plaintiff administratively.

21. Officer Gammon credibly testified that during this period of time, Plaintiff was detained in a secure secondary area, and Officer Gammon maintained control over Plaintiff's identification

5

document(s) and his car keys.  Officer Gammon himself stayed in the room with Plaintiff, except only to take a phone call from immediately outside the door.  Plaintiff was not free to leave, which Plaintiff himself ultimately admitted at trial during cross examination.

22.  Plaintiff was compliant throughout the period of his detention and, finding no prior criminal history or previous administrative fines or penalties, the CBP officers assessed the minimum administrative penalty against Plaintiff in the amount of $500.

23.  The CBP officers also seized the steroids, and Plaintiff was provided a custody receipt for the seized property, signed by Officer Gammon and, as well, by Plaintiff, who signed a Violator/Importer Information Form, which identified the property seized, and on which Plaintiff made application under 19 U.S.C. § 1618 and 19 C.F.R. 171.21 for administrative relief from the referenced statutory liability.  That relief was granted, a penalty amount of $500 was assessed against Plaintiff, and Plaintiff paid the fine with his credit card.

24.  Plaintiff received and acknowledged receipt of a three-page Notice of Seizure and Information for Claimants.

25.  Plaintiff admits to having purchased the steroids in Mexico, but claims that he purchased them for a man by the name of "Brian," whose last name he does not know.  Plaintiff contends that

6

"Brian" called Plaintiff on his telephone while Plaintiff was in Mexico for two days with DuBois, and asked Plaintiff to buy the steroids for him.  Plaintiff still does not know Brian's last name or whereabouts, although Plaintiff contends that he knew him at the time as someone also in the construction business.

26.  DuBois testified that he had no memory or personal knowledge about a third party calling Plaintiff during their two days together in Mexico to ask Plaintiff to pick up some "medicine" for him.

27.  DuBois does recall being left in the waiting area at the CBP building when they took Plaintiff away and, when Plaintiff was finally released and returned, Plaintiff said to DuBois, "Man, they almost arrested me, you know."

28.  DuBois, who had traveled to Mexico with Plaintiff on a number of previous occasions, "to buy the medicine and have fun with the girls," testified that the events of the border stop on that day, and being ordered to get out of the car, was "the kind of incident you remember," . . . "kind of a big deal."

## Plaintiff's USCIS Interview on June 6, 2008

29.  It was to the day exactly three years and eight months after this "memorable" episode, what DuBois regarded as "kind of a big deal," that Plaintiff on August 21, 2007, subscribed under penalty of perjury to the truth of the contents of his N-400

Application for Naturalization in which he denied that he had ever been detained by any law enforcement officer for any reason.

30.   When an N-400 Application is received by USCIS, it is in time randomly assigned to a USCIS officer to process and to conduct an interview of the applicant.   USCIS Officer Raul Borrego, who also testified at trial, received Plaintiff's N-400 Application to process.

31.   Officer Borrego learned from government sources of Plaintiff's detention at the Laredo Port of Entry for failing to declare anabolic steroids and of the penalty assessed against him.

32.   Officer Borrego observed, however, that on his sworn N-400 Application, Plaintiff had answered "No" to the question that asked if he had "**ever**" [bold emphasis in original Form N-400] been detained by any law enforcement officer for any reason.   To a similar question on the Application asking, "Why were you arrested, cited, detained, or charged?," Plaintiff responded, "NONE."

33.   Officer Borrego personally interviewed Plaintiff on June 6, 2008, at which time he orally asked Plaintiff many of the questions covered on the Form N-400, carefully marked each question asked and answered with a red checkmark, and wrote on the form with a red pen by way of addendum any additional information provided by Plaintiff.   In doing so, Officer Borrego adhered to a rigid process he has consistently employed in conducting thousands of such interviews.

34.   Given   the   discrepancy   between   Plaintiff's   sworn Application denying he had **ever** been detained and CBP's records of Plaintiff's 2003 detention, Officer Borrego specifically asked Plaintiff if he had ever been arrested, cited, or detained by any law enforcement officer for any reason, and Plaintiff under oath answered, "No."

35.   Officer Borrego, in order to give Plaintiff further opportunity truthfully to disclose his 2003 detention, prepared and presented to Plaintiff a Record of Sworn Statement, in which Plaintiff, after having been duly sworn, was asked a series of additional questions, which he answered in the negative, and then signed a sworn statement which included the following questions and his own handwritten answers:

> Q.   Have you ever been arrested or detained by a law   enforcement   officer,   including Immigration?
>
> A.   No
>
> Q.   Have you ever smuggled controlled substances or drugs into the country?
>
> A.   No
>
> Q.   Have you ever been issued a ticket or been fined   by   an   immigration   officer   for   any illegal activity?
>
> A.   No
>
> Q.   Have you ever been ordered by a court to pay a fine;   go   to   jail;   serve   a   probationary sentence;   perform   community   service;   make restitution;   or   have   your   wages   garnished

9

> (e.g., for failure to make child support
> payments)?
>
> A.   Yes traffic tickets.

36.   Officer Borrego asked the questions orally, and asked if Plaintiff plainly understood the questions, or if he needed any clarification.   Plaintiff assured Officer Borrego that he understood the questions and he asked for no clarification.

37.   Contrary to Plaintiff's unfounded accusation that Officer Borrego was being "tricky" or unfair in the interview, Officer Borrego proceeded professionally and methodically, giving Plaintiff ample opportunity to focus on the points of inquiry and to be forthcoming and truthful about what had been a "memorable" detention by law enforcement officers, cost Plaintiff a penalty of $500, and which, as Plaintiff told DuBois at the time, nearly resulted in Plaintiff's arrest.

38.   After having taken Plaintiff's additional sworn statement in which Plaintiff swore never to have been detained by any law enforcement officer, and never to have been fined, Officer Borrego disclosed that he knew about Plaintiff's Laredo Port of Entry detention, the confiscation of his anabolic steroids, and the $500 fine paid by Plaintiff.

39.   Once Plaintiff knew that Officer Borrego knew of Plaintiff's prior detention by law enforcement, he admitted to the event and variously stated that he had not remembered the event,

that he did not believe his border detention was being asked about, that he had a different definition of "detention," and the like.

40.  Persuaded that Plaintiff had given false testimony with a subjective intent to deceive USCIS for the purpose of obtaining immigration benefits, USCIS denied Plaintiff's N-400 Application on June 9, 2008.

### Plaintiff's Administrative Appeal

41.  Plaintiff perfected an administrative appeal from the denial of his N-400 Application.

42.  In support of his appeal, Plaintiff prepared and executed an affidavit dated July 2, 2008.  In this affidavit, Plaintiff asserts that at the Port of Entry when the border patrol officer asked the usual questions, "Do you have any fruits, medicine, foods, or any other item to claim," the following transpired:

> Without hesitation, I [Plaintiff] presented the bag to the officer and asked if this was okay for me to bring these items back to the States. Immediately, the Border Patrol Officer asked us to get out of our vehicle and they searched the entire car with dogs.  I was informed by the Border Patrol Officer that what I was trying to bring in were steroids and they were illegal.  I was interrogated for some time, but I told the officers that I did not know these were steroids nor did I know it was illegal to have possession of them.
>
> We were released and I had to pay a fine of $500.00 for administrative fees.

11

43.   In dissembling the truth of the border stop in his affidavit, Plaintiff falsely claimed to have presented his bag of anabolic steroids to the border patrol officer, which he did not do either at primary inspection--when DuBois presented the bag of his own medicines--nor upon secondary inspection, when Officer Gammon discovered the anabolic steroids concealed under the front passenger seat.   Plaintiff did, however, truthfully acknowledge that he "was interrogated for some time," and that he was later "released and . . . had to pay a fine of $500.00."

44.   Plaintiff went on falsely to state in his affidavit that "the border patrol officers did not search my vehicle and found [sic] the steroids hidden in my car."

45.   Additionally, Plaintiff procured from his companion DuBois a separate affidavit, which was evidently typed on the same word processor and with the same format as Plaintiff's affidavit, dated the same date [July 2, 2008], and putatively sworn to and subscribed before Emilio Gonzalez, notary public for the State of Texas, who on the same date notarized Plaintiff's affidavit.

46.   The content of DuBois's putative affidavit substantially tracks Plaintiff's affidavit, often using the same words, phrases, and even sentences, except to put it in the voice of DuBois.

47.   DuBois's sworn testimony presented at trial was that he did not type the July 2, 2008 affidavit, but that it was "just a document" that was handed to [him] by [Plaintiff].   DuBois

12

testified that Plaintiff asked DuBois if he could sign it, and that he "read over it real quick and signed it." DuBois further testified that he did not sign the document in the presence of a notary: "I didn't get it notarized. I just signed it and that was it."

48. The putative DuBois Affidavit--prepared by Plaintiff-- recited that Plaintiff "received a call from one of his ex-coworker to ask him for a favor. He asked if he could pick up some medicine for him while we were in Mexico. He provided him with the name of the medicine . . . ." DuBois's testimony presented at trial, however, was that he did not recall Plaintiff receiving any such phone call, and that he did not "recall anything about anybody asking him [Plaintiff] to buy anything."

49. During trial, Plaintiff falsely testified that DuBois wrote his putative affidavit in his own handwriting, that Plaintiff did not remember if he himself gave the affidavit to DuBois, and that Plaintiff did not remember if DuBois typed it up.

50. DuBois's contrived affidavit of July 2, 2008, was the handiwork of Plaintiff. It contained--as did Plaintiff's own affidavit of that date--false assertions presented as fact.

51. Plaintiff filed his own false affidavit and the putative affidavit of DuBois with the subjective intent to deceive for the purpose of successfully advancing his administrative appeal to obtain immigration benefits.

52.  On April 16, 2009, the USCIS denied Plaintiff's administrative appeal, and subsequently Plaintiff filed this case for *de novo* review.

### Plaintiff's Trial Testimony

53.  Plaintiff at first falsely testified at trial that he had truthfully answered Question no. 16 on his Form N-400 Application for Naturalization, namely, "Have you **ever** [emphasis in original] been . . . detained by any law enforcement officer . . . for any reason?," to which Plaintiff answered, "No," although on cross-examination Plaintiff *admitted* that he was detained by law enforcement at Laredo.

54.  Plaintiff at first falsely testified that he had truthfully answered Question No. 16 on his Form N-400, "Have you **ever** [emphasis in original] been . . . cited by any law enforcement officer . . . for any reason?," to which Plaintiff answered, "No," but then on cross-examination Plaintiff *admitted* that this testimony was false, claiming (notwithstanding the uncontroverted evidence that Plaintiff is proficient in English) that he thought the word "citation" meant an "appointment."

55.  Plaintiff testified at trial that when he was repeatedly asked by Officer Borrego if he had "**ever** been . . . detained by any law enforcement officer . . . for any reason," that it "never crossed [his] mind" about his having been stopped at the Port of

14

Entry in Laredo, removed from his vehicle, searched by CBP officers, detained in a secure secondary area of the CBP building while awaiting a decision on whether he would be criminally charged and arrested, subsequently processed administratively, and assessed a $500 penalty that he paid before he was finally released to rejoin DuBois in the waiting area.

56.   Plaintiff's assertion that the foregoing episode "never crossed [his] mind" is simply not credible, especially given his friend DuBois's acknowledgment of what a "big deal" it was, plus the additional facts of its recency and of its having been the only occasion Plaintiff is known to have been detained by law enforcement.

57.   Plaintiff falsely testified at trial that DuBois himself wrote DuBois's affidavit in his own handwriting.

58.   Plaintiff falsely testified at trial that he did not remember if he had given the DuBois affidavit to DuBois for him to sign.

59.   Plaintiff falsely denied at trial that the anabolic steroids he was transporting on December 21, 2003, were concealed under the front passenger seat where he was seated when he entered secondary inspection at the Laredo Port of Entry.

60.   Plaintiff falsely denied at trial that the anabolic steroids were found under Plaintiff's seat by Officer Gammon.

61.   Plaintiff falsely testified at trial that Officer Borrego stamped his N-400 Application for Naturalization as "denied" in Plaintiff's presence at the conclusion of his interview on June 6, 2008.

62.   Plaintiff's various falsifications, distortions, semantical gamesmanship, and dissembling, while under oath during his interview by Officer Borrego, and as well, in Court when testifying in his own behalf, constituted false testimony given by Plaintiff for the purpose of obtaining immigration benefits, to wit: naturalized citizenship in the United States.

63.   Plaintiff's false testimony at every stage of the administrative and currently the judicial proceedings has been given with the subjective intent to deceive for the purpose of obtaining immigration benefits, namely, naturalized citizenship in the United States of America.

64.   Based upon Plaintiff's false testimony given with the intent to deceive for the purpose of obtaining immigration benefits, both in the administrative proceedings, and most recently while testifying in this Court on November 11, 2010, the Court finds that Plaintiff has not proven by a preponderance of the evidence that he has been a person of good moral character during the five years before he filed his Application for Naturalization and continuously since then through the date of trial on November 11, 2010.

65.  Plaintiff has failed to prove his eligibility for naturalized citizenship by a preponderance of the evidence.

66.  Resolving any doubts in favor of the United States and against the applicant, Plaintiff has not shown himself to be entitled to naturalized citizenship.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1.  The Court has jurisdiction of the parties and of the subject matter of this case.  8 U.S.C. § 1421(c).

2.  An applicant whose application for naturalization has been denied can seek judicial review under 8 U.S.C. § 1421(c). "Judicial review of naturalization denials is always available and is *de novo*, and is not limited to any administrative record but rather may be on facts established in and found by the district court *de novo*." Aparicio v. Blakeway, 302 F.3d 437, 445 (5th Cir. 2002).

3.  The applicant must prove by a preponderance of the evidence that he meets the general requirements for naturalization. 8 C.F.R. § 316.2(b); Nyari v. Napolitano, 562 F.3d 916, 919 (8th Cir. 2009); *see also* United States v. Hovsepian, 359 F.3d 1144, 1168 (9th Cir. 2004).  Although two circuits in cases relied upon by Defendants have held that the burden of proof required to prove good moral character is by clear and convincing evidence, no Fifth

17

Circuit case has been found to support that proposition. *See* Dicicco v. INS, 873 F.2d 910, 915 (6th Cir. 1989); El-Ali v. Carroll, 83 F.3d 414 (Table), No. 95-1013, 1996 WL 192169, at *4 (4th Cir. Apr. 22, 1996) (unpublished op.). Accordingly, the Court concludes that Plaintiff on *de novo* adjudication in this Court must prove his eligibility in this case by a preponderance of the evidence, the same standard required during administrative proceedings. *See* 8 C.F.R. § 316.2(b).

4.   All doubts are resolved "in favor of the United States and against" the applicant. Bustamante-Barrera v. Gonzales, 447 F.3d 388, 394-95 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 1247 (2007). He must "show his eligibility for citizenship in every respect." Berenyi v. District Director, INS, 87 S. Ct. 666, 671 (1967). Strict compliance with all the prerequisites to the acquisition of citizenship is required. Fedorenko v. United States, 101 S. Ct. 737, 747 (1981).

5.   In order for an applicant to become a naturalized citizen, the Immigration and Nationality Act (INA) requires that the applicant:

> (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years . . .
>
> (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and

> (3)  during  all  the  periods  referred  to  in  this
> subsection  has  been  and  still  is  a  person  of  good
> moral  character,  attached  to  the  principles  of  the
> Constitution  of  the  United  States,  and  well
> disposed  to  the  good  order  and  happiness  of  the
> United  States.

8 U.S.C. § 1427(a).

6.   The statutory period for which good moral character is required  begins  five  years  before  the  application  for naturalization is filed and continues until the applicant becomes a  United  States  citizen.   8  U.S.C.  §  1427(a)(3);  8  C.F.R. § 316.10(a)(1).

7.   Congress has erected several statutory bars to a finding that  an  applicant  possesses  good  moral  character.   8  U.S.C. § 1101(f) provides, in relevant part:

> No person shall be regarded as, or found to be, a
> person  of  good  moral  character  who,  during  the
> period for which good moral character is required
> to be established, is, or was --
>
> .  .  .
>
> > (6)   one who has given false testimony for
> > the  purpose  of  obtaining  any  benefits
> > under this chapter. . . .

U.S.C. § 1101(f)(6).  *See also* 8 C.F.R. § 316.10(b)(2)(vi).

8.   To  be  determined  to  lack  good  moral  character  under 8 C.F.R. §310.10(b)(2)(vi), an applicant must give false testimony with the subjective intent to deceive for the purpose of obtaining

immigration benefits.  Gonzalez-Maldonado v. Gonzales, 487 F.3d 975, 977 (5th Cir. 2007).  "[M]isrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy" do not meet this requirement.  Kungys v. United States, 108 S. Ct. 1537, 1551 (1988).  The false testimony need not actually be material, however.  Id.

9.  Additionally, "[t]he fact that any person is not within any of the [specified] classes [of those who shall not be regarded as persons of good moral character] shall not preclude a finding that for other reasons such person is or was not of good moral character."  8 U.S.C. § 1101(f).  An applicant's moral character is evaluated "on a case-by-case basis taking into account . . . the standards of the average citizen in the community of residence."  8 C.F.R. § 316.10(a)(2); see also Brukiewicz v. Savoretti, 211 F.2d 541, 543 (5th Cir. 1954).

10.  Because Plaintiff has not proven himself to be a person of good moral character within the meaning of the statute during the five years before filing his N-400 Application and up to and including the trial of this case, he is not eligible for United States citizenship.

11.  Defendants are entitled to the entry of a Final Judgment that Plaintiff take nothing and that this case be dismissed on the merits against Plaintiff.

12.   If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

### ORDER

After conducting a *de novo* review and trial, and for the reasons set forth in the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED that Plaintiff Juan Edgar Alvarez Oropeza's Petition for Declaratory Judgment that he is a person of good moral character and is eligible to be a naturalized citizen of the United States is in all things DENIED.  Plaintiff shall take nothing, and his cause is DISMISSED on the merits.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 23rd day of November, 2010.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

21